Your Honor, this case is subject to speeding statute. Here are your names please. Ataka Laser Ctr. v. McCullough and Brittice V. V. Bryceborough Brittice V. V. Bryceborough O'Hare Engineering v. Appellees arguing on behalf of v. McCullough and Thomas W. Hooch III arguing on behalf of v. Appellees Mr. Kent Maynard Mr. Hooch Thank you, Your Honor Good afternoon, sir. Good afternoon, ma'am. Good afternoon. Good afternoon. May it please the Court, Tom Hooch on behalf of the plaintiff we have only one defendant, O'Hare Engineering the other, Brittice Bryceborough before my entry into the case have been dismissed out, I'm sure. The Court knows the matter comes before you after the granting of a summary judgment motion. We maintain that there were issues that would have precluded that and we believe primarily the affidavits submitted with our response to the motion summary judgment should not have been stricken. We believe that in a case of truly first impression that the affidavit, particularly the affidavit of the expert we retained provided some insight. Unfortunately, one judge struck the affidavit and said a different judge heard the summary judgment arguments. And the decision came down based on really two cases which are really the center focus of this appeal. One is the Texas Barker case out of Texas and the other is the Irmer case that originated here in Illinois. The difficulty with both of those cases is that there were insurance companies trying to assert subrogation rights. We believe Article 14 of the contract, first of all we believe it is ambiguous. But even if you determine that it's not ambiguous. It's not a what? If you determine that the contract clause is not ambiguous we still maintain it only, I keep hearing a horn going off and I think it's my cell phone and I get nervous, I'm sorry. We maintain that that applies to an insurance company trying to assert subrogation rights. That's the whole purpose behind that. We at no time suggested in our complaint, third amendment complaint that we were seeking to recover money that your insurance company had already paid us. There's no question the mediation they paid several million dollars but it came nowhere close to the total amount of loss. I mean this was not just in the medical office, this was the surgery center. He was out of business as president for the third amendment complaint for well over a year. I mean the loss income alone totals close to nine million dollars. We got nothing over close to that from ERA and all we seek and there may well be a set off by the appellee if the matter proceeds to trial of what we did recover. But what we're seeking is the money that we did not recover from ERA and we don't believe that's covered by the subrogation clause contained in article 14 of the contract. Unfortunately we can find no case in Illinois that says that. But again the cases that are cited apply to insurance companies. They indicate that through the construction period and thereafter if the contract agrees there will be a subrogation waiver. But you can't say that the fellow who was damaged is asserting subrogation rights. I mean he waives them on behalf of his insurance company but not on his own behalf to recover full damages. I mean that's a keystone of the law that we should be allowed to recover our full compensatory damages after we suffer a loss and that's all we're really seeking. And I don't have a whole lot more to say than that because it really comes down to how you construe article 14 of the contract between Ryan and Dr. Rataka. If you find that that subrogation clause means that subrogation is now going to buy insurance then I guess we lose. But I think as you study the contract there would be no purpose for such a clause. And even the Illinois case that's been well cited holds that it's designed to protect insurance carriers and their insurance from the back and forth give and take of subrogation and allow a construction project to proceed without lengthy litigation by insurers. Ergo it should have no application to a plaintiff who is only trying to recover damages that have not been recovered previously. The waiver of subrogation relates to the idea that owner and Ryan waive all rights against each other and against their respective agents, employees, and subcontractors. For subrogation? For damages caused by perils covered by the insurance. It doesn't say by subrogation, at least not the copy I have of the quote. Justice, I'm sorry. My interpretation of that entire paragraph is it affects subrogation rights and only subrogation rights. I'm not sure if I answered your question totally. You see, there would be no purpose to such a clause if it didn't affect subrogation. Why would anybody enter into a contract that says no matter what you do wrong, we agree to work through you? I mean, that would make, first of all, it would probably be against public policy because you're waiving your own damages before you commit it. And if we construe that paragraph to mean that, then you're not waiving. You may be waiving the other person's ability to strike that. You are waiving your rights to sue the other party, named party, based upon their negligence. How are you waiving your own negligence? No, what I'm saying is we're waiving. Each party is waiving the other's negligence. If you construe that paragraph that way. What I'm suggesting to you is to the extent there's insurance in force, you waive that right of subrogation. But this goes over and above what was recovered. And why would you be waiving a right of subrogation if you don't have a right of subrogation? You have a direct right to sue and tort. If there was negligence committed by one party against the other, it's a direct suit for tort. It is not based upon your rights of subrogation. Is it? No. Your complaints seem to me to read as if you were suing the defendant based upon negligence and tort, not based upon some sort of breach of contract. That's exactly correct. Or seeking declaratory judgment on whether or not an insurance policy did or did not, quote, unquote, give you relief. You're exactly correct. The count to a 30-minute complaint sounded to negligence and tort. Isn't that what you're suing? I thought that's what you were suing. Yes, sir. But we don't believe that that article was intended to bar us from recovering against either riot construction or the subcontracts. And bear in mind, the contract ran. We couldn't bring a breach of contract suit because there weren't necessarily a party to the contract. O'Hara was not a party to the contract that contains the subrogation. If after final payment, property insurance is to be provided on the completed project, the owner shall waive all rights against the design builder and against its respective agents. Now, is it your claim that the insurance settlement was not a final payment because you didn't get all you wanted? We maintain that there were damages in excess of what we received from the insurance company. That was our own insurance company that we mediated and recovered. Does this clause provide that if the final payment is not what you consider to be sufficient, that the rights are not waived? The final payment to the contractor? Or to the insurer? To the insurer. The insurer that's making the claim. We maintain that that clause did not require income protection insurance. It required the property to be insured against certain perils, and the loss of income was not subject to that clause. And was fire a peril covered by insurance? Yes. So is the immunity granted for a peril covered by insurance, which in this case is fire and therefore there is no liability, or as you are apparently interpreting it, only for damages that are caused by the peril of fire but isn't covered by insurance? Yes, and only to the extent that we recovered from our insurance company. That prevents our insurance company from asserting a right of suffocation because we waived that right. It says waive all rights against each other for damages. Now, it seems if you're waiving all rights for damages, you're waiving all rights for damages. You're not waiving all rights for damages that aren't covered by insurance. At least I don't see that here because the covered by insurance relates to the perils that are covered by insurance. Yes, sir. And we maintain that the definition of a donor's risk policy does not include, and it was also subject to our expert's affidavit that was stricken, does not include income. I know, but doesn't your builder's loss policy include perils by fire? Yes, during construction. So it includes perils by fire and it includes waiving all rights, but it only relates to those damages that are covered by building loss and don't relate to the waiver of rights of those things that aren't covered by a builder's right or risk insurance policy, which you didn't get anyway. No, no, he went out and bought a Cadillac. If I follow your logic properly, then since you didn't get builder's risk insurance, but you did get income loss policy, that if you were to get a judgment against the defendants, you'd be entitled to all the damages because supposedly the insurance proceeds that you received from the insurance company would not be an offset because there wouldn't be a waiver for those things. I would really like to, and I hope that you'll grant me the opportunity to make that argument in the trial court at trial because I think they will ask for something. That presumes that when you talk about damages, you're talking about utter and complete and total recovery of all damages that you claim might be covered by whatever policy that you enter into. Yes, sir. Does that paragraph or does that clause say those things? No, it's one of the things that has to be. You have an affidavit from a lawyer who claims, who asserts that he is an expert in contract insurance law. Is that correct? Correct. And I think under the circumstances, his comments in his affidavit would have been very helpful to the trial court. What was that? That this was not a policy that barred the owner. It was a contract provision that barred the owner's insurance company from suing to recover what the owner's insurance company had already paid off. I thought that this clause comes from a contract between you and Ryan or your client and Ryan. This isn't part of an insurance contract. That's correct, sir. So why would an insurance contract expert be opining about a contract and a particular clause in a contract between a builder and an owner of some premises? Because I believe that he construed that article as I construed it to be something directed to prevent an insurance company from suing and not an owner. He further opined that income protection or income loss is not part of a builder's risk policy, that a general builder's risk policy covers liability and loss through perils during the construction period. It starts at a zero value, and as the project is built, the value increases on the policy to cover what would have been a total loss. But it didn't contemplate a building being uninhabitable for well over a year and a fire taking place when patients were being in surgery. I don't have any other questions if you want to proceed with the rest of your argument. That is it, sir. Any other questions? I'll hold five minutes for goodbye. Yes, you'll have your opportunity to make quick calls. Thank you, Doctor. Thank you. Mr. Maynard? May it please the Court. My name is Kent Maynard, and I represent O'Hare, the Applebee. This case concerns, as I think we've already seen in the colloquy, the correct interpretation of one section, one paragraph of the construction agreement between O'Hare, excuse me, between Ryan and Ritaka, Ritaka, the Applebound. And the Court is asked to construe that paragraph 14C and determine whether the subrogation waiver applies, in this case, to business interruption loss or business interruption damages that were caused by a fire. There's no dispute that there was business interruption damage, and there's no dispute that those business interruption damages were caused by a fire. So what we need to determine here today is does 14C waive subrogation claims for, to recover damages, business interruption damages caused by fire. Who wrote the contract, just out of curiosity? You know, it's a good question. I would like to know that, because typically, you know, in all candor, many of the cases that we see, the reported cases we see that involve subrogation waivers, involve American Institute of Architects, AIA contract forms, standard forms. This is a manuscript policy, and I suspect that it was drafted by Ryan, but I don't know that. When you say manuscript policy, are you talking about a manuscript contract? Excuse me. Yes. I'm sorry. I meant to say manuscript contract. It's not a form contract that's promulgated by the American Institute of Architects. So it does complicate the analysis a bit. However, we can demonstrate, Your Honor, if we go through. Well, let's assume, if I could, that if the owner is required to purchase and maintain insurance, and I would assume that it's a requirement instead of something that he wants to do, although it appears that he at least wanted to buy better insurance than this type of policy, that the fact that there wasn't, in fact, a policy, that there would then be a waiver of subrogation to the extent that whatever rights are set forth in the subparagraph C would be binding on the parties. Yes. That is exactly correct, and that's exactly the position that we've taken. If I may, the subrogation, there are three distinct subrogation waivers in paragraph 14C. The first one refers to a mutual release of claims between Ritaka and the general contractor and the subcontractors who include my client O'Hare. It's a mutual release, and it basically says that the owner and the general contractor and all the subs waive any claims for damages, not to the extent they're covered by the insurance to be maintained pursuant to paragraph 14B, which is the project-specific coverage, which they didn't buy, but they are waiving any claim or they're waiving damages that are caused by, and here this is a very critical distinction here, caused by a peril that is covered by that policy. There's a huge difference here intellectually between waiving damages covered by the insurance, which is the position that this is the reading that we're hearing from. Waiving damages caused by perils. Exactly, and the reason is because this language is actually more favorable to the notion of subrogation than the typical American Institute of Architects form, which typically does say, to the extent covered by the insurance, maintained, the project-specific insurance maintained, or any other, but then they broaden it by saying, or any other insurance. So some of the reported decisions do talk about that language, but here it doesn't matter, and indeed it doesn't even matter whether the policy defined in 14B requires business interruption coverage or not, and the reason is very simple. It may be, I think, you know, when we have a dispute like this, I don't think that this Court really cares what my personal opinions are. I mean, I don't think you should. I think you should care what the language of the contract is, and what the language of the contract says is there are three distinct waivers in 14C. The first one says, and the lead-in language would be that Ritaka, and for the first one is that Ritaka and the general contractor and subcontractors waive all rights against each other for damages caused by perils covered by the insurance to be maintained pursuant to paragraph 14B. So the only question we need to ask here, Your Honors, is, number one, is the business interruption damage that is being pursued in this case, is that damage that was caused by a peril? And the answer is yes. The peril was fire. And we have another question. Well, if it was caused by fire, and that's the peril, is fire a covered peril under this policy of insurance that is defined in paragraph 14B? And the answer is there can't be and there isn't any dispute that an all-risk policy, whether it be a builder's risk or any other kind of property insurance, has to cover fire as a peril. It always does. I defy anyone to find a property insurance form. I don't know that it has to so much as it always does. Well, okay. But I would say there's, you know, this could be a policy between arsonists or pyromaniacs. Okay. But the point is, the point of the difference, the distinction I'm trying to make, Your Honor, is that an all-risk policy basically says we cover everything unless we exclude it. So it makes no sense to say that we're going to get an all-risk policy, but we have to go and then look and see does it require a business interruption. That's not the way an all-risk policy works. The presumption is, the starting point is everything's covered unless we exclude it. So if we look at this first waiver, we ask whether, is this business interruption damage caused by a peril? Yes. The peril is fire. Is that peril fire covered by this 14B policy? The answer is yes. End of story. That means that damages caused by fire are excluded, and this is what their complaint alleges, that these damages for business interruption. Well, the damages caused by fire are excluded if whatever the contracted for insurance covered such a peril. Well, the contracted for insurance has to cover the peril. That's what I just said. Right. And here, the contracted for insurance, 14B insurance, covers fire as a peril. Yes. So then we say, okay, what are we trying to recover here? We're trying to recover business interruption damage. What was it caused by? Fire. Then we ask the question, is fire covered peril? Well, is the business interruption insurance even relevant material if the contract doesn't provide for such coverage? Which contract? The construction contract, 14B? The construction contract. It provides for builder's risk insurance. I'm not sure I understand your question. My question is, you said it's got to, and I said it has to unless they're pyromaniacs or arsonists. I see what you're saying, that there could be wrongful acts which are intentional which would be uninsurable as a matter of public policy. Not necessarily. What I'm saying is, is that if the typical always has to, business risk policy covers the peril of fire, then it doesn't make any difference whether they got life insurance or automobile liability insurance or anything, because if the car burned up by fire, who cares, right? Right. Under this contract, it's builder's risk. Whether or not you have a car and it's burned by fire, you relate to a car insurance policy. This talks about the premises, does it not? Not a car? Right. It's property insurance that covers premises. It's a building, medical building. And if the contract provides for an insurance policy known as builder's risk, and every builder's risk policy covers the peril of fire, why is it relevant and material if in covering the peril of fire, it covers lost wages, it covers interrupted service, it covers landscape, whatever you want to include in the insurance contract? What difference does it make if the peril is fire? I don't agree with you. That's precisely your argument. But I thought you said something slightly different. Oh, no. I apologize, then. I misspoke. I think you dropped off part of the end clause where you were further conditioned on the basis of... I apologize. But the other thing is discussion about what the insurance was and the settlement that took place based upon lost business is really not relevant to what this contract says. I totally agree. I absolutely agree. Because our analysis, driven by the first of the three waivers in 14C, is we look to the policy to be maintained pursuant to 14B. We ask if it covers the peril which caused the damages which are being pursued, and if it does, that's the end of the analysis. It's also irrelevant as to whether or not there was business loss insurance because if there wasn't coverage of the peril of fire, there never would have been a settlement. I think that's right. So, therefore, if there was a settlement, I think we can infer, without actually examining the insurance contract that was purchased, that one of the perils that was included in the business loss policy was the peril of fire. So the making reference to the two contracts is irrelevant because both contracts covered the peril of fire, and, therefore, under your argument, it doesn't make any difference which contract you refer to. Both covered the peril of fire. I agree. In fact, that's what the second and the third waivers in paragraph 14C do. The first one is a neutral waiver between the owner and the general contractor for damages caused by a peril covered by the project-specific policy, which they never bought. Then we have these two other additional waivers, the first of which talks about and begins with saying if during the construction period the owner insures property, personal or real or both, at or adjacent to the site, the site, I guess, being here, the place where the work was being performed, then we have the same waiver, Your Honor. The waiver is the same. It's the same concept. The waiver is triggered by peril. So the analysis is just the same. So you're saying that this second part of the clause would apply to the business loss contract that Supposal was entered into? Exactly. And, indeed, if you look at the transcript of the hearing on summary judgment, Judge Fuse, the argument has been made that, look, when you look at 14B, the 14B policy that we were required to maintain, it doesn't have to have business interruption. So we, out of the goodness of our heart, went out and bought this better policy. Why shouldn't you get the benefit effect? And the answer is because that's what the 14C language says. It doesn't talk about coverage. It doesn't say that you're waiving to the extent that something is covered. You're waiving damages which are caused by a peril fire that is covered by the policy. Now, you could say, well, there could be some harsh consequences because you could have, actually, frankly, you would hand that to an insurance professional, and what he should say to the owner is, look, you're going to have to buy builder's risk, all risk. It's going to cover fire. You'd be crazy not to, but it's going to cover fire anyway. And when you do that, because you're insuring fire as a peril, you're waiving all the damages which are caused by fires. And we all know, and in this case it's especially true, that one of the damages that's caused by fires is direct physical harm to bricks and mortar, tangible objects. But also, in this case especially, one of the elements of damage, which is a particularly important element here, is business interruption. And, indeed, the Irma case talks about this and says, you know, there have been numerous attempts to narrow the scope of segregation labors, and the most recent of which is this Empress case in the casino in Joliet, which, by the way, has some language which is actually quite pertinent here. But the problem here is that we're not looking at the language of 14C. We're talking about what our opinions are about what the world should be like. And I don't understand. Are you talking about you and me, or are you talking about the appellant's lawyer? I'm saying that it doesn't matter what any of the lawyers in this room think, other than the panel, about what should be. What we have to do is look at, because of freedom of contract, because segregation labors are a favorite of the courts, because they're an economically efficient way of allocating risk, because everybody in the project basically says to the owner, we're not all going to buy insurance duplicatively. We're not going to then, or, and then have a problem, and then everyone's pointing fingers at everybody else, and then 10 years later the project is still incomplete because we're all litigating who's at fault. We're going to treat ourselves as a single entity. It's kind of a no-fault zone. And we're going to look exclusively to the insurance carrier to make us whole. Anyway, may I just finish with two thoughts then? Judge Foose looked at the second waiver, and he said, you know, even if you're right, counsel, even if this business interruption isn't somehow included in the policy that was maintained in court pursuant to 14B, it would come in under the second waiver. And then if you said, well, wait a minute, what if, you know, the question that you raised, Your Honor, what if this occurred after substantial completion, then we have the third waiver, which kicks in. And that says, if after the construction period, the owner, and by the way, this is a one-way waiver, owner waiving his claims, but not the other way. If after the construction period, owner goes out and buys an insurance, his policy or policies, we don't even talk about what kind of insurance. But if it affords coverage for the project, then that's waived. So we have this very broad concept. We waive based on the construction period and project-specific insurance. Then we waive as to any other policies which are enforced during that period. That's the second waiver. And then even after the project is complete, we waive with respect to any coverages which are in place there. It's a little like the concept of subrogation here. First of all, to say that the owner isn't covered is nonsensical, because the way that you eradicate subrogation claims is you go to the subrogor, the one who owns the claim, the owner. And he waives his claim, and then everybody else is bound. That's why it's done that way. So it simply makes no sense to say that this only binds the insurer. It doesn't bind the owner. Well, of course it binds the owner. That's what creates the subrogation. The waiver of subrogation. I'm buying for my time. I apologize. Any questions? No. Thank you. Your time is up. Thank you. And you adequately close. Mr. Gooch, it says you're the third. My father was an egomaniac. Was he also a lawyer? No, he was a major general in the United States Army until his retirement. And what about your grandfather? My grandfather was a South African who was in the military. Gooch is Dutch, huh? No, it's English, actually. It's what? English. English. English. Or so I'm told. Okay. So I'm told. But I had a brother who he also named Thomas. Really? I have a brother. Don't ask. Was he the fourth or did he have a different middle name? I have a son who was the fourth. He fortunately, I guess, had only girls, so he named the firstborn one Thomasina. Very good. All right. Moving past the family tree, I think that 14C relates back to donor and risk insurance. And I think the whole- Only? Are you saying only? I'm sorry, sir? Are you saying it only relates back to that? The first part of the waiver. Now, you get into another question on permanent insurance, on further waivers. That's why I maintain this whole section is ambiguous, because you really don't know what it is. You told me earlier that it's not about subrogation. I think it's everything about subrogation. That's the whole point of the statute. And when an insurance company asserts its subrogation rights, it does so in the name of the owner. So, of course, the owner would waive those rights. But only to the extent of the type of policy that he had to cover, and it can only apply, or should only apply, to the extent that he receives payment from the insurance company. It stops a second tier of litigation by the insurance carrier after the insurance carrier pays off, then going back to recover under subrogation from the contractor. But when the insurance company doesn't pay off, it should have no application. In questioning perils, it cuts off a whole line of cases that say you're entitled to be compensated for your losses. It was portrayed as a waiver of subrogation, and there has to be a payment in order to waive it to stop the insurance carrier from going. URI would have sued them long ago if it wasn't for that clause. But it doesn't cut off the owner's damages. It shouldn't cut off the owner's damages. You're arguing what should happen when dealing with what the contract says. I believe that clause is ambiguous. I don't believe that it clearly sets forth what it means, and I think it needs to be interpreted, and I think it only can be interpreted to allow someone to recover the damages that are covered by notice risk or similar insurance. Well, weren't the damages covered to the extent that you received $2 million or $3 million? Oh, no. Oh, no. That was a fully functional surgical center. I mean, there were 18 different physicians. Well, you had insurance coverage for business interruption, did you not? Yes, sir, income loss. And did you receive $1 or more in settlement of that claim? No. You didn't? No. No, we have, according to his account, approximately $9 million of lost income. Is that in the record? No. Well, I shouldn't say that. And was the loss based upon a difference of opinion as to the amount of the loss, or was it based upon an exclusion? I don't know the answer to that question because it was obtained through mediation. I don't believe anything was excluded from the property insurance. Were general releases given between the insurance company and your client after the settlement was made? Yes. Yes, the only litigation was against Erie. None of the contractors were part of that. The only litigation was against Erie. No insurance would pay anything. You may proceed. Thank you, Judge. Thank you. We'll take the case under advisement. The court is adjourned. There are no further cases on the floor. Thank you.